UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

AMY L. SACKS
*Plaintiff*
V.

PERKIOMEN VALLEY SCHOOL DISTRICT;
PERKIOMEN VALLEY SCHOOL DISTRICT BOARD OF DIRECTORS;
BARBARA A. RUSSELL;
BRIAN ALLEBACH;
JUDITH LOFTON;
MATTHEW DORR;
SARAH EVANS-BROCKETT;
EUGENE J. HALUS, JR.;
REENA KOLAR;
KIMBERLY MARES;
BETH A. ROBERTS;
WAYDE WESTON;
LAURA WHITE;
*Defendants*

CIVIL ACTION NO.:

2:20-cv-06155-JS

CIVIL ACTION:

1. 1ST AMENDMENT - FREE SPEECH RETALIATION
2. 1ST AMENDMENT - POLITICAL ASSOC. RETALIATION
3. 14TH AMENDMENT PROCEDURAL DUE PROCESS
4. DECLARATORY RELIEF

*JURY TRIAL DEMANDED*

# FIRST AMENDED COMPLAINT

FRANCIS ALEXANDER, LLC
Alfred J. (AJ) Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 341-1063
F: (215) 500-1005

THE BEASLEY FIRM, LLC
James E. Beasley, Jr., Esquire
1125 Walnut St.
Philadelphia, PA 19107
T: (215) 392-1000
F: (215) 592-8360

*Law Firm / Lawyer for Plaintiffs*

## Introduction

1. Plaintiff Dr. Amy Sacks was fired as a principal by her public school employer, and then severely demoted, because she compared Democratic presidential candidate Joe Biden's intellect to a potato and posted other right-of-center political memes opposing Democratic politicians, opposing riots, and supporting police, such as:







2. Amy was a 20-year veteran of the Perkiomen Valley School District, and principal for the last seven years of Evergreen Elementary. She is a third-generation resident. Under her leadership the school was one of the top 15 in the Commonwealth.

3. Amy's stellar performance was not enough to save her from Cancel Culture, and liberal bureaucrats who believe that privately holding opinions to the right of Hillary Clinton are grounds to ruin a colleague's career and life because they view her as their political opponents.

4. The notion that a public employee without a disciplinary record could be severely

disciplined ***without notice*** for privately posting memes opposing Joe Biden, Nancy Pelosi, and Chuck Schumer—all high ranking Democratic political leaders—is almost beyond comprehension.

5. The actions by the Defendants are blatant violations of Amy's First Amendment rights to free expression and political association. There is absolutely no reason for a governmental employer to even address Amy's private political Facebook posts and memes in a professional context.

6. Furthermore, because the School District decided to terminate and demote her ***without notice*** it also egregiously breached her Fourteenth Amendment Due Process rights.

7. Defendants had an absolute duty to give her notice and the opportunity to defend herself. They deliberately failed to do so, instead disregarding all constitutional norms and procedures to attack and retaliate against a longtime colleague who dared express political opinions they despise.

*****

## Background

### Defendant Superintendent Dr. Barbara Russell Ambushes Principal Dr. Amy Sacks at what was Supposed to be a Routine Evaluation on June 22, 2020

8. Dr. Amy Sacks is a 20-year veteran of the Perkiomen Valley School District. For the past 14 years she has been an administrator, and the last seven years has been principal of Evergreen Elementary School. Under her leadership, the school is one of the top 15 elementary schools in the Commonwealth. She has no prior disciplinary history.

9. Amy, like many Americans, privately participates in political discourse on Facebook, as well as posts things unrelated to politics. Most of Amy's political postings are

memes on candidates and current events. Amy is a conservative and her posts reflect conservative opinions. These posts were on her private account and were unrelated to her job.

10. Nevertheless, Amy's career and life came to a crashing halt when her public school employer found out that she had been making conservative Facebook posts.

11. Amy was told by defendant superintendent Barbara Russell to attend her regularly scheduled year-end evaluation meeting on June 22, 2020, and to bring "evidence of your rating and ideas for next year":

Amy Sacks has accepted this invitation.

**End of Year Evaluation - A. Sacks**

When Fri Jun 26, 2020 1pm – 2pm Eastern Time - New York

Where https://us02web.zoom.us/j/7278264794?pwd=haQSQ9OaXJlewNQaeuKmdJ3tlENplw (map)

Calendar Barbara Russell

Who
- Barbara Russell - organizer
- Amy Sacks

Please bring evidence of your rating and ideas for next year.
Barbara Russell is inviting you to a scheduled Zoom meeting.

See Exhibit 1. This was routine and gave Amy no cause to suspect that anything was amiss.

12. Little did Amy know, it was a bad-faith set up. The Superintendent, defendant Dr. Barbara Russell, had no intention of discussing her evaluation, rating, or ideas for the future.

13. Instead, Russell blindsided Amy by laying out 15 cherry-picked political memes from Amy's private Facebook account posted over the past few months. See Exhibit 2. Russell told Amy that it had already been decided to terminate her because of the posts. The only thing connecting the posts was right-of-center political opinions. A selection of them are shown here:
























See Exhibit 2.

14. Amy was told by Russell that her private Facebook posts had offended a parent who had complained to the District. Instead of properly telling the parent that Amy was permitted to post what she wanted on her private account, the District terminated Amy from the principal position without warning.

15. Amy was told by Russell that she was being terminated because these posts were offensive, unacceptable, and unprofessional. Russell alluded that she believed that Amy was racist and could be fired on that basis.

16. Russell is known to support left-wing causes, and attended a Black Lives Matter rally in suburban Philadelphia in 2020.

17. To be clear, the topics of these private posts are ***obviously*** core protected expression under the First Amendment. A public school cannot attempt to dictate acceptable political opinions to employees, nor can it tell those employees *how* to privately express themselves on political and social issues.

18. There was absolutely no valid, legal reason for the school to raise these Facebook posts with her, much less to do so without providing her any notice they would be discussed or that disciplinary action was being taken against her. The fact that the posts were curated and cherry-picked solely based on Amy's opposition to Democratic politicians and left-wing opinions and movements is outrageous.

19. During the meeting Russell, as a flimsy pretext, laid out policies and guidelines regarding the use of official school social media accounts and district devices and claimed that the District though that Amy ***might*** have violated them. See Exhibit 3. In reality, not one of these policies applied or were grounds for discipline against Amy. ***Indeed, after June 22, Defendants never mentioned these policies again*** or performed an investigation. It is made clear that potential violations of these policies were raised as a pretext because Russell stated that the decision to terminate her had been already made by the Board before the June 22 meeting.

20. At this point Amy was sobbing, totally shocked by what was going on.

21. Russell told her while she was terminated from the principal position, that Russell would work to have Amy demoted instead of fired completely from the District. Amy was stunned as she had never previously been formally disciplined in her professional academic career.

22. This termination and discipline without notice violated the Public School Code of 1949, as well as the due process protections afforded by the U.S. Constitution and applicable precedent.

23. The notion that a public employee without a disciplinary record could be severely disciplined ***without notice*** for posting memes as a private citizen opposing Joe Biden, Nancy Pelosi, and Chuck Schumer—all high ranking Democratic political leaders—is almost beyond comprehension.

24. The Defendants' actions make it abundantly clear that Russell and the other Defendants, overwhelmingly liberal democrats, were punishing Amy for expressing opinions they disapproved and while denying Amy due process and any chance to defend herself.

25. Defendants' conduct has a massive chilling effect on the free speech rights of school employees, students, and parents. Everyone is on notice that only one set of political opinions is acceptable and that deviation from the literal party line will result in harsh and immediate punishment.

26. There is no question that a similarly situated left-wing administrator who made similar political posts would not have been disciplined by Defendants and would not have had her due process rights violated. To even ask the question, is to answer it. The treatment Amy Sacks was exposed to is reserved for conservatives, Republicans, and Trump voters.

27. Russell and the other defendants' conduct is proof that bureaucrats in the public school system have been outlawing opposition to their political ideology. Liberal democrats in the public school system are casting opposition to left wing politics as illegitimate and illegal—while ignoring employees' constitutionally protected rights to freedom of expression.

28. The Courts heavily frown upon such plainly illegal and baseless conduct: "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics…." West Virginia State Board of Education v. Barnette, 319 U.S. 624 (1943). "If an employee can show that the agency knew that the reason for the threatened removal could not be substantiated, the threatened action by the agency is purely coercive" and illegal. Schultz v. United States Navy, 810 F. 2d 1133, 1136 (Fed. Cir. 1987).

29. These rights are not only enshrined in the US and PA constitutions, but also in Defendants' board policies. See Board Policy 320 ***Freedom of Speech in Noninstitutional Settings*** ("The Board acknowledges the right of its employees, as citizens in a democratic society, to speak out on issues of public concern."); Board Policy 321 ***Political Activities*** ("The Board recognizes and encourages the right of its employees, as citizens, to engage in political activity.").

30. Amy asked at the June 22 meeting as it progressed whether she should have an Act 93 representative present to record the meeting, ***and Russell responded that the decision had already been made and that it would be pointless***. This is indicative of bad faith and a desire to avoid creating a record which would later incriminate Defendants.

31. Amy asked for less harsh alternatives such as a performance improvement plan (PIP) or counseling. These were flatly rejected. Amy was also never advised to retain counsel. It is standard policy at the district to impose incremental discipline and improvement plans before resorting to termination or demotion, a policy which was disregarded by Defendants because of their desire to punish Amy for her politics.

32. Note that prior to Defendants learning about the Facebook posts in June 2020, they had no grounds or plans to terminate, demote, or otherwise discipline Amy Sacks. In other

words, the only thing that actually caused Defendants to terminate/demote her, without due process, was Defendants learning about her private political Facebook posts.

33. At no point during the June 22, 2020 meeting were any actual charges identified or levied against Amy. It was made expressly clear that the decision to discipline her had been irrevocably made, and it was also made clear that the only thing to be decided was whether, in addition to terminating her as principal, she would be permitted to continue in a demoted position. It was made clear that any attempt to contest what was happening would result in her total termination from the district.

**Defendants Fail to Tell Dr. Sacks what is Happening for Eight Terrifying Days, Until a July 2, 2020 Meeting Where She is Told She will Be Demoted, in Addition to Being Terminated from the Principal Position; Defendants Fail to Identify Any Charges, Provide Her a Hearing, or Advise Her to Retain an Attorney**

34. Following the June 22, 2020 set up, Defendants delayed for eight days and did not tell Amy what was happening. Amy was terrified and desperate to save her job and career. At no point was she told to obtain counsel, nor was she given formal notice of charges against her and the supporting evidence.

35. Indeed, after June 22, 2020, it was treated as decided by Defendants that discipline was being imposed. The only thing left to determine was the punishment.

36. On July 1, 2020, Dr. Russell and Brian Allebach (the HR director) requested an in-person meeting.

37. The meeting occurred on July 2, 2020. Again, no Act 93 rep was present, the meeting was not recorded, and Amy was not advised to obtain counsel.

38. The meeting solely concerned what type of demotion Amy was going to take, made it clear that it was because of the Facebook posts, made it clear that her time as principal

and an administrator were finished, and it was also made clear that the only other option other than full termination from the District was a severe demotion.

39. No actual charges were identified that could warrant the termination or demotion of Dr. Amy Sacks.

40. At all points it was clear that Amy was being punished for her Facebook posts; this was so because this is what defendant Russell had told her she was being terminated/demoted for on June 22, 2020, and in the subsequent meetings.

41. At this meeting, Defendants did not raise or address any alleged school-related conduct by Sacks or any other alleged situations or "complaints" about Sacks from prior years.

42. At the July 2, 2020 meeting, Amy was told that they were going to try to place her in the "Inclusion Facilitator" position out of the District Office, subject to Board approval. This meant being demoted from an administrator to a teacher and losing pay, vacation, and valuable benefits.

43. She was threatened that if she tried to contest anything there would be a hearing—on what she was not told—and that it would not go well for her. This threat was effective as Dr. Russell had told Amy at the June 22 meeting that she was terminated from the principal position, and from the school district unless Russell had her demoted instead.

**Defendants Delay for Another Eight Terrifying Days, before a July 10, 2020 Meeting Takes Place; Defendants Tell Amy that She Has to Accept a Demoted Position Which was in Fact a Disguised Termination**

44. Following July 2, 2020, was another eight days of terrifying silence. She was not told to get an attorney, nor was she told what she was charged with. Amy believed during this time period that to keep her job she had to keep everything strictly confidential and obey her employer.

45. On July 10, 2020, another meeting took place. At this meeting, Defendants told her that she had been rejected by the Board for the inclusion facilitator position out of the District office, and that instead she would be even more severely demoted to the instructional support teaching position at Middle School West.

46. Again, she was shocked but desperate to keep her job and career. She asked repeatedly if there was anything else she could do to keep her job, such as counseling, but was told that the decision had been made.

47. In fact, at Perkiomen Valley there is supposed to be an incremental approach to discipline (if discipline is warranted), where counseling or other less severe options are first used to give the employee a chance to improve. This approach was entirely and discriminatorily disregarded by Defendants for Sacks due to their retaliation against her for her private political expression and right-of-center political affiliations.

48. At all points the regular and usual rules and practices of the District were disregarded and ignored, all with the intent and goal to prejudice Amy's rights

49. What Amy did not realize at the time was ***why*** the District had chosen this specific position for her demotion. It was chosen by Defendants because ***it was a long-term substitute position*** for a teacher out on maternity leave. Basically, when that teacher came back from leave, Amy would be out of a job and Defendants would have no obligation to hire her to a new position.

50. ***In other words, it was a disguised termination which would quietly take effect in a few months***.

51. Amy tried to reach out to Allebach with thoughts and concerns following the July 10, 2020 meeting, still unsure what to do about what was happening to her, but heard nothing substantive.

52. At the July 10 meeting, nothing but the demotion was discussed, with Defendants treating the decision to discipline Amy as final.

53. It must be noted that Defendants knew that Amy had her family have deep ties to the school district and the area, that Amy is incredibly dedicated to her job, and that Amy was reeling and trying to save face in front of her friends and family due to this humiliating experience. Defendants used this knowledge to further coerce, pressure, and force Amy to do what they wanted while undermining her rights.

**Without Warning Defendants Surprise Amy Sacks on July 13 with a Demotion Letter their Attorney Drafted; They Demand that She Sign it in Mere Hours**

54. Amy heard nothing after the July 10, 2020 meeting, until she received a surprise email from Brian Allebach at 11:52 am on July 13, 2020.

55. Attached to the email was a letter drafted by District solicitor Brian Subers, which Amy had never seen before, did not take part in drafting, and had no idea existed. It was titled "Consensual demotion" and also said that she was going to "resign" and be "demoted." See Exhibit 5; Exhibit 6.

56. Allebach told her in an email that the letter was drafted by the District's solicitor, Brian Subers of Fox Rothschild. However, the letter itself was written as if it came from Russell, which obscured that this letter was filled with (erroneous) legal advice.

57. The title and text of this letter took great care to repeatedly characterize Amy's demotion as consensual despite the fact that nothing about this situation since it started on June 22 had been consensual—but instead absurdly coercive, threatening, and predetermined:

Re: Consensual Demotion

Dear Amy,

In follow up to our meeting on Friday, July 10, 2020, the purpose of this correspondence is to confirm your agreement to resign from your position as Principal at Evergreen Elementary School and accept a reassignment to the position of Instructional Support Teacher. As we discussed, this assignment results in your removal from the District's administrators group and designation as a member of the Perkiomen Valley Educational Association.

Your reassignment to the Instructional Support position constitutes a demotion under Section 11-1151 of the Public School Code. Under that section, you have the right to either consent to the demotion or request a hearing before the Board of School Directors regarding the proposed action. Please note that your resignation and reassignment are scheduled for Board approval at its July 13, 2020 business meeting.

Exhibit 5. Note that Amy did not agree to resign; she was told in no uncertain terms on June 22 that she was fired as principal but might be allowed to continue in a teaching position. The characterization of her termination as a resignation was unilaterally done by the district, and is more evidence of bad faith. She was flatly told in the subsequent July 2 and July 10 meetings that her continuation as principal or as an administrator was not an option.

58. Defendants' repeated mischaracterization of the discipline against her as "consensual" and as a "resignation" demonstrates knowledge that the discipline was illegal. Defendants portrayed the discipline as "consensual" to attempt to immunize the District and its personnel against liability for their actions.

59. The letter continued:

Based on our conversation, it is my understanding that you do consent to the proposed action. Accordingly, I am requesting that you countersign and date this correspondence on the lines provided below to confirm the same. The terms of this agreement will be executed upon the approval of the Board, to be determined at the Business Meeting on July 13, 2020.

I sincerely regret that these actions have become necessary. However, in light of the circumstances presented, your continued service as Principal at Evergreen Elementary School is no longer a viable option. I believe your reassignment is in the best interest of all involved.

I sincerely wish you the best of luck in this future endeavor. Please let me know if there is any way I can further assist you in our joint mission to promote the educational opportunities and welfare of our students.

Id.

60. Again, the letter repeatedly attempts to recharacterize the purely involuntary termination and demotion of Amy as consensual, in an Orwellian attempt to rewrite history.

61. Not only was this false legal advice regarding the proper procedure, as explained below, but the charges that were being brought against Amy that could justify such a hearing were never identified either in the letter or the preceding 3 weeks.

62. The failure to identify the charges against Amy that could possibly warrant the drastic sanctions being pushed by Defendants is another indication of bad faith. If the District truly had legitimate grounds for terminating and demoting Amy, any letter such as this would at least outline the legal and factual basis for the demotion.

63. The letter also did not inform Amy that the position she was being demoted to was, in effect, a way to terminate Amy when the position expired in a few months.

64. The text of the letter unconscionably demanded that she sign the letter by the Board meeting taking place on July 13, 2020—***which was in just a few hours.*** Yet again, for the umpteenth time in the last three weeks, Amy was reeling in confusion.

65. After three weeks of inexplicable delay and limbo she was being told she had to immediately sign this heavily lawyered letter out of the blue.

66. During the day and evening of July 13, Allebach repeatedly told Amy she had to sign the letter immediately, and that Russell was upset that Amy had not signed it as the day progressed.

67. Defendants sent this letter, and engaged in the deficient conduct that preceded, to avoid having to comply with the due process protections afforded by the U.S. Constitution and the Public School Code of 1949.

68. Eventually, under pressure and threat of further discipline, Amy was forced to sign the letter, and sent it to Allebach at 7:05 pm. Sacks noted in the email that she was unhappy how this was going down: "Sorry if this is late; however, this timeline is less than ideal for me as I had to hurry up and wait [for three weeks] and now we are rushing through…."

69. Within minutes of receiving it, the Board approved the alleged resignation and demotion mid-meeting demonstrating that punishing Sacks had become a special priority for the defendants.

70. Nothing about this letter was or is legitimate:

a. **First**, it is inexcusable to foist a legal document drafted by the Defendants' attorney on Amy after a three-week delay, give her just hours to sign it, and repeatedly tell her she needs to sign it for the Board meeting. Defendants knew that due process had not previously been provided to Amy, that they had violated the Public School Code of 1949,[1] and that this letter seriously affected and prejudiced Amy's rights. The only reason for such haste was to prejudice her rights and prevent her from obtaining legal counsel and advice. A good faith process would have given her time to digest the letter, told her to get an attorney, and provided her time to find an attorney.

b. **Second**, at no point was Amy told to seek legal counsel from June 22 to July 13 by Defendants. Despite the fact that this letter provided (erroneous) legal advice to Sacks, and was a tremendously significant legal document drafted by Defendants' attorney, the text of the letter does not tell her to get an attorney—nor was she provided the time to do so. She was also not told to get an attorney before this point. Again, had Defendants been acting in good faith, none of this would have happened.

c. **Third,** the letter inexplicably failed to identify the charges against Amy Sacks. The only reason to omit this critical information was because Defendants knew that identifying the Facebook posts as the reason she was being dismissed would be legal suicide. In fact, the letter tells Amy she can have a board hearing but fails to identify what the charges against her were that would occasion such a hearing, her termination, or a demotion.

d. **Fourth,** the letter does not explain that the position she is being demoted to is a temporary position and that Defendants had no obligation to continue Amy's employment after the position expired.

---

[1] Act of March 10, 1949, P.L. 30, *as amended,* 24 P.S. §§ 1–101 –27–2702.

e. **Fifth,** the letter provided erroneous legal advice to Amy Sacks regarding due process. Defendants and their attorney knew that due process was entirely absent from Defendants' actions against Sacks. Yet, despite the fact that due process was lacking, the letter falsely told Amy that her choices were to "consent" to a demotion and resignation, or face a Board hearing. In fact, as described in this complaint, the Supreme Court requires that Sacks have been provided a Loudermill notice identifying the charges and evidence against her, and a Loudermill hearing. A board hearing only takes place after all these steps have been completed. A Loudermill notice and hearing are supposed to take place so that the employee can know what they are accused of, have the opportunity to be heard, and can fully evaluate the situation. Defendants deliberately circumvented this process to prejudice Amy's rights.

f. **Sixth,** at no point did the District inform Amy that the letter written to her was drafted by Subers and Fox Rothschild was filled with legal advice and that Sacks should obtain independent counsel. Instead they drafted a highly prejudicial letter which not only provided Sacks false legal advice, but forced her to make a prejudicial legal decision on just hours notice.

g. **Seventh**, at no point did any Defendant step in to ensure due process was followed despite knowing that due process was not being followed. Nowhere in any of these proceedings did the name "Loudermill" appear. Instead, Amy was told she was terminated without notice from the principal position on June 22, 2020. The delays and trickery in the following three weeks were no better. This is practically inconceivable given the importance of the Loudermill decision and its universal implementation by public agencies such as school districts.

71. Nothing about this letter was or is legitimate as described above. The things that happened here are utterly inexcusable and violate Amy's right to free expression and right to due process. The fact that they were done with the approval, supervision, and participation of attorneys is completely unacceptable. That practicing attorneys participated in this shameful farce is a complete betrayal of attorney ethics and the US Constitution they are sworn to uphold.

72. Again, at no point did Defendants ever raise Loudermill, consider whether Amy's rights were being protected, or inform her to get counsel.

**Amy was Terminated on June 22 and then Demoted; However, Even if the Termination is Considered to be a Resignation, it was a Forced and Coerced Constructive Discharge**

73. A resignation is considered a constructive discharge if it was "involuntarily procured" "by coercion or duress," or by misrepresentations of material fact. See Judge v. Shikellamy School District, 905 F. 3d 122 (3d Cir. 2018); Schultz v. U.S. Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987). An example of an involuntary resignation based on coercion is a resignation ***that is induced by a threat to take disciplinary action that the agency knows could not be substantiated***. Staats v. US Postal Service, 99 F.3d 1120 (Fed. Cir. 1996).

74. The same is true for involuntary and forced demotions. Nicholson v. Petco Animal Supplies Stores, Inc., 409 F. Supp. 3d 323, 333 (M.D. Pa 2019) (stating that where employer's threats and other circumstances showing that the only two options given to the employee "were demotion and unemployment" a demotion is not "truly voluntary").

75. To the extent that Defendants claim that Amy Sacks resigned or consented to a demotion, she was unequivocally forced to involuntarily resign and was constructively terminated and demoted.[2]

76. This was a malicious prosecution, one without any cause or legal basis, conducted without any due process. Defendants were not allowed to take any negative action against her whatsoever because of her Facebook posts, but did so anyway.

77. Amy was told on June 22 without notice or the opportunity to defend herself that the Board had already decided to terminate her from the principal position due to the Facebook memes. She was later told she was going to be allowed to remain at the district but only with a severe demotion. She was told that if she contested anything the Board would fully terminate her

[2] To the extent that this signed letter is viewed as an agreement, it is invalid. Amy was induced to sign this letter by erroneous and materially incomplete legal advice. Furthermore, there was no consideration for this letter and/or the consideration provided was illusory. Amy got nothing from this letter she was not already legally entitled to, and lost everything.

after a hearing. Even worse, the "demotion" was a disguised termination because it was a substitute position that would expire in several months.

78. Where the prosecution and threats of termination are baseless, and the result of coercive threats and situations, the Courts will invariably rule that a resignation/demotion/termination was involuntary and forced. This is doubly so when the basis for discipline was blatantly unconstitutional viewpoint and political retaliation.

**Following July 13, Amy Sacks Realizes that Her Rights May Have Been Violated and Retains an Attorney; Barbara Russell Begins a Nonsensical Cover Up Further Demonstrating Defendants' Bad Faith**

79. Following Amy's constructive termination from the principal position, and her being forced to take a severe demotion, she retained an attorney.

80. On August 13, 2020, counsel for Sacks sent a letter to Defendants explaining that what they had done was illegal. See Exhibit 7. The letter demanded reinstatement to the principal position, that her name be cleared, as well as money damages and First Amendment training for District personnel.

81. Bizarrely, just hours after confirming receipt of the letter on August 13, 2020, defendant Russell finalized year-end evaluations for Dr. Sacks in a panic. See Exhibit 8 - Email from Russell Confirming Receipt. This was done directly as a result of the letter counsel sent to Russell on August 13.

82. Remember, the evaluation for Amy never even took place as scheduled on June 22, 2020, because Russell instead used the scheduled meeting to ambush Amy regarding the social media posts and tell her she was being terminated/demoted.

83. It is thus impossible that any legitimate evaluation could have been finalized because no evaluation ever took place.

84. What did this fake evaluation say and what was its purpose? Given that it was drafted in a panic, the content is understandably contradictory.

85. **First**, the evaluation concludes that Amy's overall performance as principal was "proficient," which is a completely acceptable rating and demonstrates that there was no cause to fire/demote Amy without warning.

86. **Second**, the content of the evaluation admits that Amy was demoted because of the private Facebook posts, which Russell tries to label as "unprofessional" to make the firing appear legitimate.[3] This is nothing less than an admission that the Facebook posts were, at a minimum, a substantial motivating factor in Amy's discipline.

87. This admission in the evaluation unequivocally establishes that ***without the Facebook posts Sacks would not have been terminated/demoted or disciplined.***

88. It is critical to keep in mind that it is undisputed ***that prior to June 2020 the District was not considering terminating, demoting, formally reprimanding***, nor taking any other formal disciplinary action against Sacks for any reason.

89. The only precipitating event and reason for the termination and demotion in June 2020—the "but for" and proximate cause of the discipline—was because of the Facebook posts given to Defendants in June 2020. Without these Facebook posts, the District's own course of conduct indisputably shows they would not have formally disciplined, terminated, or demoted Amy.

---

[3] The ridiculous characterization of Amy's private political expression as "unprofessional"—as if such a flimsy pretext allowed Russell to terminate Amy—demonstrates the pernicious and Orwellian attack that took place on Plaintiff. Note that the attempt to portray the posts as unprofessional is blatant pretext, when the District clearly took political umbrage, found the posts offensive based on ideology and viewpoint, and told Amy as much in the meeting.

90. **Third**, the fake evaluation goes significantly off the rails when Russell names several parents Russell asserted had communication issues with Sacks. The problem is that Sacks had never been approached about these parents in a disciplinary context when they happened,[4] and most of them were extremely dated. The notion that they were included by Russell in a 2019-2020 evaluation without even discussing them with Amy is absurd, especially as Amy did nothing wrong in those interactions.

91. It is furthermore flatly defamatory, and paints Plaintiff in a false light, to include these parent issues in a professional evaluation and suggest that they could warrant discipline up to and including termination.[5]

92. Russell, in her panic to window dress the illegal discipline of Amy, listed every parent situation that Amy was even tangentially involved in over the course of many years (there were only a few), and then defamatorily stated that they could justify discipline. Of course, Amy was not afforded any due process regarding these accusations.

93. Restated, Russell was (incompetently) attempting to manufacture a pretextual basis to justify the illegal discipline of Amy.

94. Despite defendant Russell's attempt to "dirty up" Amy in this fake evaluation with matters Russell never addressed with Amy as a disciplinary concern at the time they arose,

---

[4] Note also that no principal is going to be able to satisfy all parents, and that Russell's defamatory listing of a few parent situations over past years ignores that the complaints were minor and/or unfounded ***which is why no action was taken by Russell when they occurred***. All principals are going to have parent situations, and it is reprehensible for a superintendent to not address them at the time they arise, and then attempt to use them against the administrator years later to excuse away illegal retaliation

[5] At the June 22, 2020 meeting, Russell vaguely and briefly attempted to claim that a family had complained about Sacks at some point in the past. This was the first Sacks had ever heard of it. Sacks said the only interaction she had with that family involved a student medical issue (not discussed here for privacy concerns) that Sacks had to handle. Russell was shocked by this detail and immediately dropped the issue stating she had not known all the facts. For Russell to later list this parent in an evaluation to defame Amy and claim that discipline was appropriate is beyond outrageous.

all that Russell accomplished was to confirm that the political Facebook posts were in fact the only reason that Amy was disciplined without due process.

95. Had Russell thought any of these alleged issues were serious enough to warrant termination or demotion there would have been formal discipline at the time they occurred, there would be some record of them being raised with Amy in a formal disciplinary context, Amy would have been put on an improvement plan, and they would have appeared on the appropriate year's evaluation. At a minimum, they should have been raised with Amy during an evaluation process in 2020 and she should have been given a chance to respond. That none of this happened is damning.

**Plaintiff and her Counsel Attempt to Avoid a Lawsuit, Offering to Accept Only Reinstatement to Resolve the Issue; Defendants Instead Lie about Why Amy was Fired and Refuse to Reinstate Her**

96. However, following discussions between counsel, counsel for Sacks confirmed that if Defendants reinstated Sacks that would entirely resolve any dispute going forward.

97. Instead of taking this deal, the District refused and said that Sacks was going to be demoted regardless and that if she did not show up to work she would be fired.

98. Sacks is demanding reinstatement and refuses to legitimize Defendants' illegal attempt to terminate, demote, and humiliate her by taking the demoted position.

99. Defendants are further retaliating against Plaintiff by withholding monies and benefits, including for the purpose of forcing her to capitulate.

100. When counsel approached Defendants and asked them how this could be their decision in light of the fact that they had fired her without any due process because of private

political Facebook posts, they falsely claimed that Amy was demoted because of past parent complaints ***and*** also because of the social media posts.[6]

101. An email written by Subers in September 2020 falsely claims that Amy allegedly consented, in part, to a demotion on July 13 (she did not) because she had been confronted by Russell with multiple complaints from parents.

102. In no way did Amy even remotely connect the July 13 letter with any parent issue; it entirely concerned the Facebook posts.

103. Amy was not informed about the alleged parent issues until August 13. It ***is entirely impossible for these alleged complaints to have factored in any way into Amy's thinking as of July 13, 2020***. Restated, these dated complaints, which were never raised with her by defendant Russell when they arose, were unknown and/or a nonfactor for Amy as of July 13, 2020.

104. Furthermore, it is also the case that the Board was never informed nor told of past parent situations involving Amy Sacks prior to their approving the discipline against her on July 13, 2020. It is thus impossible that they considered any alleged parent issues in their decision to discipline Amy.

105. The parent issues were invented and created out of whole cloth by Dr. Russell on August 13, 2020, after receiving the demand letter.

106. All documentation from June 22 to July 13 unequivocally shows Amy and Defendants understood that she was being terminated for the Facebook posts, not for any work-related complaint or conduct. This is, of course, why the demotion letter refrains from actually identifying why Amy is being demoted, to hide the illegality of the discipline.

---

[6] It should be noted that since Defendants are admitting that the Facebook posts played a substantial motivating

107. To reiterate, the first Amy learned about all but one of these parent complaints was the fake evaluation that Russell finalized on August 13, 2020, following Defendants receiving a demand letter and request for reinstatement from Amy's newly hired attorney.

108. It must be repeated: Defendants had no intention to demote or terminate or otherwise formally discipline Amy Sacks before June 2020. The only reason Defendants decided to demote/terminate Amy was because the Facebook posts were brought to their attention.

109. What Defendants do not understand is that even raising these political Facebook posts with Amy—given to the district by a parent with political grievances against Amy's politics and expression—violated her First Amendment constitutional rights to free expression and political association.

110. Defendants' attempts to claim they could discipline her for the memes by pretextually claiming that these posts were "unprofessional" only dig the hole they are in deeper because it is black letter law that freedom of expression covers not only the content of opinion but how those opinions are expressed.

111. Note that many of the posts that Defendants label "unprofessional" are simple political stances or endorsements, making it clear that Defendants real objection is the political viewpoints they contain. Defendants are attempting to outlaw political expression they disagree with.

112. The decision to terminate/demote Amy Sacks ***without prior notice*** or the opportunity to be heard also violated her due process rights. Her due process rights were also violated by the dishonest and malicious June 22 bait-and-switch by Russell, the absurd three-week delay, the failure to provide her with a Loudermill hearing at any point, the failure to

factor in her discipline, they have admitted they illegally retaliated against Amy.

actually identify charges against her, the failure to provide her with the opportunity be heard, the failure to advise her to obtain counsel, the provision of false legal advice to her by the District solicitor, and the failure of the District solicitor to clarify his role. Her rights were further violated by Russell crafting an improper evaluation laundry listing dated issues that had never been raised with Amy in the disciplinary context, to create the false and defamatory impression Amy Sacks deserved to be fired/demoted. Not only was each identified issue false, but in combination they were false and used by Defendants to defame Amy and paint her in a false light as bad employee.

113. Note that the harm here goes far beyond Amy Sacks. Perkiomen Valley has chilled the free speech rights of every employee, student, and parent. Everyone is now on notice that if anyone expresses a thought or opinion out of sync with PVSD's leadership, the offender will be severely punished.

114. The District itself is not the only liable party. All those who participated, enabled, acquiesced, ratified, and supervised the attack on Amy Sacks are personally/individually liable because they violated her clear, unambiguous, and long-established Constitutional rights.

115. Sacks' right to free speech and political affiliation in non-school settings is as fundamental a right as can be found in United States jurisprudence, so much so that it is even enshrined in multiple Board Policies for the defendant school district.

116. Amy is requesting reinstatement and has tried to mitigate her damages.

117. The monies and benefits Defendants are withholding should be reinstated while this matter is adjudicated.

118. As a result of the outrageous conduct of the Defendants, Amy Sacks has suffered the following harms:

a. Loss of wages and benefits

b. Loss of career

c. Loss of position

d. Loss of reputation

e. Loss of free speech rights

f. Loss of due process, and

g. Severe mental and emotional damages

*****

## PARTIES

119. Plaintiff, Amy Sacks, ("Amy"), is an adult individual residing in Perkiomenville, PA. She has worked for the District for 20 years, and for the last 14 years has been a certified administrator who has the equivalent of tenure and can only disciplined for cause in accordance with due process. She is a third-generation resident, with deep ties to the area and school district.

120. Defendant Perkiomen Valley School District, ("Perkiomen Valley" or "District") is public school district in Collegeville, Pennsylvania, which employed Amy Sacks as a certified administrator, specifically the Principal of Evergreen Elementary School, since August 2012.

121. Defendant Perkiomen Valley School District Board of Directors, ("Board") is the governing body of the Perkiomen Valley School District in Collegeville, Pennsylvania.

122. Defendant Dr. Barbara Russell is Superintendent of Perkiomen Valley School District and is a resident of Pennsylvania. Defendant Russell directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

123. Defendant Brian Allebach is the Direct of Human Resources for Perkiomen Valley District, and is a resident of Pennsylvania. Defendant Allebach directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in his official and individual capacities.

124. Defendant Judy Lofton is President of the Perkiomen Valley School District Board of Directors, and is a resident of the Pennsylvania. Defendant Lofton directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

125. Defendant Matthew Dorr is vice president of the Perkiomen Valley School District Board of Directors, and is a resident of the Pennsylvania. Defendant Dorr directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in his official and individual capacities.

126. Defendant Sarah Evans-Brockett is a member of the Perkiomen Valley School District Board of Directors, and is a resident of the Pennsylvania. Defendant Evans-Brockett directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

127. Defendant Dr. Gene Halus is a member of the Perkiomen Valley School District Board of Directors, and is a resident of the Pennsylvania. Defendant Dr. Halus directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in his official and individual capacities.

128. Defendant Dr. Reena Kolar is a member of the Perkiomen Valley School District Board of Directors, and is a resident of the Pennsylvania. Defendant Dr. Kolar directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

129. Defendant Kim Mares is a member of the Perkiomen Valley School District Board of Directors, and is a resident of the Pennsylvania. Defendant Mares directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

130. Defendant Beth Roberts is a member of the Perkiomen Valley School District Board of Directors, and is a resident of the Pennsylvania. Defendant Roberts directly

participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

131. Defendant Wayde Weston is a member of the Perkiomen Valley School District Board of Directors, and is a resident of the Pennsylvania. Defendant Weston directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in his official and individual capacities.

132. Defendant Laura White is a member of the Perkiomen Valley School District Board of Directors, and is a resident of the Pennsylvania. Defendant White directly participated, supervised, ratified, and acquiesced in Dr. Sacks' discipline, termination, and demotion. Defendant is being sued in her official and individual capacities.

133. When Plaintiff refers to "defendants" or Perkiomen Valley or the District she is referring to all defendants jointly, unless otherwise specified.

134. All individual defendants, including the defendant board members, were aware of and approved Sacks' termination prior to the meeting on June 22, 2020, and were also aware of, supervised, participated in, and ratified the course of conduct against Sacks from June 22 to July 13, 2020. All Defendants were aware of, supervised, participated in, and ratified the course of conduct against Sacks from July 13, 2020, to present. Despite the entirety of the targeting of Plaintiff being utterly lawless the individuals defendants participated, supervised, approved, ratified, and acquiesced to the illegal attacks on Amy Sacks.

135. All individual defendants' conduct was of the sort that when considered separately, and in conjunction, was the type that imposes liability on Perkiomen Valley School District.

136. An individual defendant's "conduct implements official policy or practice or custom under several types of circumstances, imposing liability on the entities which employ them, including when (1) the individual acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity, (2) the individual himself has final policy-making authority such that his conduct represents official policy, or (3) a final policy-maker renders the individual's conduct official for liability purposes by having delegated to him authority to act or speak for the government, or by ratifying the conduct or speech after it has occurred." Hill v. Borough of Kutztown, 455 F. 3d 225, 245 (3d Cir. 2006); (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 478-484, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir.2005); LaVerdure v. County of Montgomery, 324 F.3d 123, 125-126 (3d Cir.2003)).

137. Here, the actions by Defendants were not that of a rogue employee, but were entirely sanctioned by the District, Board, and chief executive at all points, from prior to June 22, 2020, to present. This included:

a. Terminating Dr. Sacks as principal without her knowledge prior to the June 22, 2020 meeting in retaliation and punishment for making private right of center political Facebook posts she had made. Defendants are left wing bureaucrats and elected officials who seek to punish and cancel those with divergent opinions they find "offensive."

b. Ambushing Dr. Sacks at what was supposed to be a June 22, 2020 year end evaluation with 15 private right of center political Facebook posts she had made, and informing her that the Board had already terminated Amy for making the posts.

c. Improperly raising private right of center political Facebook posts on June 22 and afterwards with Amy Sacks and disciplining her on that basis, claiming that they justified termination because they are "unprofessional."

d. Failing to provide any notice to Dr. Sacks prior to terminating her or before the June 22, 2020 hearing.

e. Placing inapplicable policies in front of Amy Sacks and telling her that her private Facebook posts might violate those policies, to trick Amy Sacks into believe the district had the right to terminate and fire her without warning.

f. Threatening her with total termination from the district on and after June 22, 2020, if she attempted to contest what was being done to her.

g. Not allowing Amy Sacks to have an Act 93 representative present on June 22, 2020, to take minutes of the meeting.

h. Not advising Amy Sacks to retain counsel on June 22, or at any other point in the process.

i. Raising a single dated parent complaint at the June 22, 2020 ambush as a pretext, which was meritless and had never been previously raised with Sacks. Defendants also failed to disclose the content of the complaint.

j. Failing to identify any actual charges at any point in the process, especially which warranted termination or demotion.

k. Failing to provide Amy Sacks with a Loudermill notice, or providing her an opportunity to be heard in a Loudermill hearing, at any point.

l. Delaying from June 22 to July 13, 2020, with long periods of no contact, without ever identifying formal charges or the basis for termination and demotion. Note that no Loudermill hearing was ever provided or discussed, for the reason that her discipline was illegally predetermined.

m. Refusing to respond to Amy Sacks' concerns about the process from June 22 to July 13, 2020.

n. Refusing to allow Amy Sacks to have an Act 93 present at any meeting, and not advising her that she absolutely needed counsel.

o. Surprising Amy Sacks on July 13, 2020, with a letter drafted by the District Solicitor Brian Subers, which provided false legal advice to Amy Sacks, told her that she needed to sign it in mere hours, and did not tell her to consult an attorney. The letter also falsely characterized her June 22, 2020 termination as a "resignation."

p. Defendants not informing Sacks that she had certain due process rights, and not informing Sacks that her June 22 termination without notice violated due process.

q. Repeatedly telling Amy Sacks on July 13, 2020, that the letter needed to be signed immediately, without providing her time to digest the contents.

r. Forcing and coercing Amy Sacks to sign the July 13, 2020 letter, constructively terminating and demoting her.

s. Tricking and forcing Amy into taking a termination disguised as a demotion when the position she was filling was really a long term substitute position which would have expired in a short amount of time.

t. Russell drafting a nonsensical evaluation after receiving counsel's demand letter on August 13, 2020, when Amy Sacks was never actually afforded an evaluation meeting. This fake evaluation pretextually raised extremely dated parent situations from prior years that had never been raised with Amy in a disciplinary manner.

u. Russell's evaluation defaming Sacks and painting her in a false light.

v. Russell's evaluation rating Amy Sacks' performance as satisfactory but still terminating and demoting her.

w. Russell's evaluation confirming that Amy was terminated and demoted because of the Facebook posts, which Defendants pretextually labeled "unprofessional."

x. Defendants refusing to reinstate Sacks while falsely claiming that parent situations had been raised with Sacks in 2020 and were why she signed the July 13 letter.

y. Defendants refusing to pay Sacks monies or benefits to coerce her to capitulate.

138. From June 22, 2020 onward the District, Board and the individual defendants denied plaintiff due process, never even identifying the charges against her or the evidence to support the charge.

139. Not only were all these actions and omissions done at the direction of the District and Board's final policy makers, but all actions and omissions that are the subject of this lawsuit were delegated by the District and Board to the District's employees.

140. Restated, all actions by the Defendants in this lawsuit were "official" actions which impose liability on the entities, and were not the actions of individual employees acting without official imprimatur. Furthermore, even if a district employee did not have "official" authority at the time of an action or omission, the District and Board ratified that conduct by continuing and participating in the persecution of Amy Sacks.

141. The actions and omissions of the conduct were intentional, malicious, reckless, and/or negligent and demonstrated willful indifference and callous disregard for Dr. Sacks' rights.

*****

## Jurisdiction and Venue

142. Jurisdiction (and venue) over the parties in the state and federal Courts of the Commonwealth of Pennsylvania is proper. Specifically, jurisdiction as to the Defendants is proper because they are all residents of the Commonwealth and conduct business here related to the claim at issue. Defendants transacted business in this Commonwealth and caused harm and compensable injury to Plaintiff and the assignors by acts or omissions committed in the Commonwealth of Pennsylvania that are the subject of the present complaint. All such business and harm occurred in the Eastern District of Pennsylvania.

143. All federal claims are brought pursuant to and under 42 U.S.C. § 1983.

144. This case was removed from the Philadelphia Court of Common Pleas by Defendants. The Eastern District of Pennsylvania has federal question subject matter jurisdiction over this matter.

*****

## COUNT I – First Amendment Retaliation for Expression

*Amy L. Sacks*

*v.*

*All Defendants*

145. Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

146. "'[A] State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech.' *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987). To establish a First Amendment retaliation claim, a public employee must show that (1) his speech is protected by the First Amendment and (2) the speech was a substantial or motivating factor in the alleged retaliatory action, which, if both are proved, shifts the burden to the employer to prove that (3) the same action would have been taken even if the speech had not occurred. *See Gorum v. Sessoms,* 561 F.3d 179, 184 (3d Cir.2009)." Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 986 (3d Cir. 2014). The courts also hold that there are an additional two elements: (4) the employee also has to show that any ordinary employee in Plaintiff's circumstances would be deterred from engaging in similar speech by the Defendants' retaliatory conduct, and (5) that Defendants acted under color of law. Id.

147. Dougherty applies the Supreme Court's Garcetti v. Ceballos, 547 U.S. 410, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006) and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) tests, which address when a public employee's speech is protected and the considerations taken into account when dismissing an employee for speech-related reasons.

148. Here, the speech was on a private Facebook account, the content was unrelated to Plaintiff's employment, and the school has admitted to disciplining the employee because of the posts.

**First Element - Whether the Speech is Protected**

149. The first element to be satisfied is whether the employee's speech is protected by the First Amendment.

150. "As the Supreme Court has reiterated time and time again, 'free and unhindered debate on matters of public importance' is 'the core value of the Free Speech Clause of the First Amendment.' *Pickering,* 391 U.S. at 573, 88 S.Ct. 1731. Accordingly, 'public employees do not surrender all their First Amendment rights by reason of their employment.' *Garcetti,* 547 U.S. at 417, 126 S.Ct. 1951. At the same time, the Supreme Court also aptly recognizes the government′s countervailing interest—as an employer—in maintaining control over their employees′ words and actions for the proper performance of the workplace. *See id.* at 418-19, 126 S.Ct. 1951. Thus, '[s]o long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.' *Id.* at 419, 126 S.Ct. 1951." Dougherty, 772 F.3d at 993-94.

151. Under Garcetti there is a three-step inquiry to determine if speech is protected by the First Amendment: (1) the employee must speak as a citizen not an employee, (2) the speech must involve a matter of public concern, and (3) the government must lack an 'adequate justification' for treating the employee different than the general public based on its needs as an employer under Pickering. See Dougherty, 772 F.3d at 987. Under Pickering the courts "'balance... the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public

services it performs through its employees.' 391 U.S. at 568, 88 S.Ct. 1731. The more tightly the First Amendment embraces the employee's speech, the more vigorous a showing of disruption must be made by the employer. *McGreevy,* 413 F.3d at 365." Dougherty, 772 F.3d at 991.

152. There is no question under Garcetti and Pickering that Sacks' speech is protected.

153. **First**, the Facebook posts and memes in question by Amy Sacks were in her capacity as a private citizen and were unconnected to her employment. They were not made in the course of her official duties and had nothing to do with her job. The Perkiomen Valley School District's own policies specifically ensure that employees such as Plaintiff have the right to speak freely on political issues in non-school settings and to affiliate politically as they wish. See Board Policies 320 and 321.

154. **Second**, the speech in question was in fact on matters of public concern—hotly contested political issues and elections—unrelated to her job and which she directed to the public as a private citizen. Sacks' political speech on non-school issues in a non-school setting is afforded the broadest protection, as if she was a private citizen.

155. **Third**, the governmental Defendants have the heaviest burden—a burden they cannot meet—showing that Sacks' speech could cause disruption and that they should treat her differently than a member of the general public. The Pickering test arose to address where the speech in question has some relation to the employee's job which could cause disruption in the workplace.

156. Here, the speech in question has no connection to Sacks' employment at all, and thus no actual work-related disruption is conceivable that could be the basis of action for Defendants. The employer is not permitted to characterize political speech unrelated to school as controversial for the purpose of claiming it could be disruptive, especially when a single parent

allegedly disagreed with Amy's politics. Rankin v. McPherson, 483 U.S. 378, 387 (1987) (stating "[t]he inappropriate or controversial character of a statement is irrelevant to the question of whether it deals with a matter of public concern").

157. Controversial political speech is exactly the type of speech meant to be protected by the First Amendment. Allowing Defendants to claim that it can terminate employees for controversial speech would give carte blanche to the Heckler's Veto and render the First Amendment a dead letter.

158. Thus, Sacks' speech is squarely protected by the First Amendment.

**Second and Third Elements - Defendants Retaliated against Plaintiff Because of Her Protected Speech**

159. The second element is that Sacks must show that her protected speech was a "substantial or motivating" factor in retaliatory actions taken against her by Defendants, and that there was not some other legitimate reason for her termination. In other words, she needs to show causation. Mirabella v. Villard, 853 F. 3d 641, 651-52 (3d Cir. 2017).

160. In a retaliation claim, the courts ask "whether the Government is punishing the plaintiffs for exercising their rights." Id. (quoting Miller v. Mitchell, 598 F.3d 139, 148 n.9 (3d Cir. 2010)).

161. Where the retaliation includes "official speech" by the Defendants the Courts ask whether there was "a threat, coercion, or intimidation, intimating that punishment, sanction, or adverse regulatory action will follow." Id.

162. Here, there is no question that the governmental employer punished Sacks for exercising free speech rights on political issues they disagreed with, and that Defendants' speech included overt threats, coercion, and intimidation, as well as intimation of punishment and sanction. This is not a close case.

163. Sacks was expressly told by Defendants that the adverse actions by Defendants against her were because of the content of her political Facebook posts, which are protected speech.

164. This is established not only by Defendants' express statements to Sacks on June 22 that she was being terminated because of the content of the Facebook posts, but also by the selection of posts by the District on which to discipline Amy (curated from months of Facebook posting to cherry pick 15 private right of center political posts) demonstrates that Defendants were retaliating against Plaintiff because of political differences and her political affiliation.

165. Defendants were not considering any disciplinary action against Plaintiff, until they learned about the Facebook posts.

166. The fake evaluation drafted by defendant Russell on August 13, 2020, confirms that the Facebook posts were in fact the basis for the discipline.

167. Overall, Sacks was disciplined, terminate, and demoted as punishment for privately expressing political views Defendants did not like and found offensive. The evidence is overwhelming that the posts were an impermissible but substantial motivating factor in Plaintiff's firing.

168. There are many specific examples of retaliatory actions which are independently and jointly actionable:

a. Terminating Dr. Sacks as principal without her knowledge prior to the June 22, 2020 meeting in retaliation and punishment for making private right of center political Facebook posts she had made. Defendants are left wing bureaucrats and elected officials who seek to punish and cancel those with divergent opinions they find "offensive."

b. Ambushing Dr. Sacks at what was supposed to be a June 22, 2020 year end evaluation with 15 private right of center political Facebook posts she had made, and informing her that the Board had already terminated Amy for making the posts.

c. Improperly raising private right of center political Facebook posts on June 22 and afterwards with Amy Sacks and disciplining her on that basis, claiming that they justified termination because they are "unprofessional."

d. Failing to provide any notice to Dr. Sacks prior to terminating her or before the June 22, 2020 hearing.

e. Placing inapplicable policies in front of Amy Sacks and telling her that her private Facebook posts might violate those policies, to trick Amy Sacks into believe the district had the right to terminate and fire her without warning.

f. Threatening her with total termination from the district on and after June 22, 2020, if she attempted to contest what was being done to her.

g. Not allowing Amy Sacks to have an Act 93 representative present on June 22, 2020, to take minutes of the meeting.

h. Not advising Amy Sacks to retain counsel on June 22, or at any other point in the process.

i. Raising a single dated parent complaint at the June 22, 2020 ambush as a pretext, which was meritless and had never been previously raised with Sacks. Defendants also failed to disclose the content of the complaint.

j. Failing to identify any actual charges at any point in the process, especially which warranted termination or demotion.

k. Failing to provide Amy Sacks with a Loudermill notice, or providing her an opportunity to be heard in a Loudermill hearing, at any point.

l. Delaying from June 22 to July 13, 2020, with long periods of no contact, without ever identifying formal charges or the basis for termination and demotion. Note that no Loudermill hearing was ever provided or discussed, for the reason that her discipline was illegally predetermined.

m. Refusing to respond to Amy Sacks' concerns about the process from June 22 to July 13, 2020.

n. Refusing to allow Amy Sacks to have an Act 93 present at any meeting, and not advising her that she absolutely needed counsel.

o. Surprising Amy Sacks on July 13, 2020, with a letter drafted by the District Solicitor Brian Subers, which provided false legal advice to Amy Sacks, told her that she needed to sign it in mere hours, and did not tell her to consult an attorney. The letter also falsely characterized her June 22, 2020 termination as a "resignation."

p. Defendants not informing Sacks that she had certain due process rights and not informing Sacks that the June 22 termination without notice violated due process.

q. Repeatedly telling Amy Sacks on July 13, 2020, that the letter needed to be signed immediately, without providing her time to digest the contents.

r. Forcing and coercing Amy Sacks to sign the July 13, 2020 letter, constructively terminating and demoting her.

s. Tricking and forcing Amy into taking a termination disguised as a demotion when the position she was filling was really a long term substitute position which would have expired in a short amount of time.

t. Russell drafting a nonsensical evaluation after receiving counsel's demand letter on August 13, 2020, when Amy Sacks was never actually afforded an evaluation meeting. This evaluation pretextually raised extremely dated parent situations from prior years that had never been raised with Amy in a disciplinary context when they occurred. It is highly improper to import alleged issues from prior years into a year-end 2020 evaluation.

u. Russell's evaluation defaming Sacks and painting her in a false light.

v. Russell's evaluation rating Amy Sacks' performance as satisfactory but still terminating and demoting her.

w. Russell's evaluation confirming that Amy was terminated and demoted because of the Facebook posts, which Defendants pretextually labeled "unprofessional."

x. Defendants refusing to reinstate Sacks while falsely claiming that parent situations had been raised with Sacks in 2020 and were why she signed the July 13 letter.

y. Defendants refusing to pay Sacks monies or benefits to coerce her to capitulate.

169. All the retaliatory actions were intended as punishment, and were taken by the Defendants because they desired to punish Sacks for expressing viewpoints they disagreed with.

170. Note that even a baseless suspension with pay for a retaliatory reason is itself actionable on its own and by itself. See Smith v. Borough of Dunmore, 633 F. 3d 176, 180 (3d Cir. 2011).

171. Smith illustrates the egregious nature of Defendants' actions. Smith held that a suspension without notice or a hearing is an extreme measure only appropriate in cases where

public safety is directly implicated—a reason which is not even remotely applicable in this case. Id.

172. Here, Sacks was terminated without warning or notice on June 22, 2020, because of Facebook posts.

173. The third element of a First Amendment retaliation claim states that when Sacks has shown political retaliation played a part in her termination, then the burden is on the Defendants to show that there was some other legitimate reason for their actions. See Connick v. Myers, 461 U.S. 138, at 152-53 (1983) (explaining that the greater the extent to which the speech involves matters of public concern, the stronger the employer's showing must be).

174. The evidence, and Defendants' own admissions, overwhelmingly prove that Defendants' actions were solely retaliation for Sacks' private Facebook post, and that they cannot meet any such burden.

175. Defendants have attempted to claim, *ex post facto*, that Amy was terminated from her position both because of past parent complaints *and* because of the Facebook posts which were "unprofessional."

176. Defendants' defense falls flat for three reasons:

**a. It is Undisputed that No Discipline of Any Kind was Contemplated by Defendants for Amy Sacks before June 2020**

i. Prior to June 2020, when Amy Sacks' Facebook posts were brought to the attention of Defendants, it is undisputed that Defendants had no plans to discipline Amy Sacks, much less terminate her.

ii. Defendants have attempted to portray the early May 2020 faculty comment, and alleged parent complaints from prior years, as supporting discipline against Amy.

iii. Yet, it is beyond any dispute that Defendants never initiated any discipline prior to June 2020. Thus, it is beyond any dispute that the Facebook posts were the reason for the discipline.

iv. Restated, but for the Facebook posts, no discipline would have been imposed.

b. **Defendants' Admit that Speech Retaliation was both a Substantial and Motivating Factor for the Discipline**

i. Even if Defendants' argument is credited in full, ***this is still an admission of full liability***. Defendants are admitting that the content of the Facebook posts were a significant motivating factor in their termination and demotion of Amy.

ii. Defendants have claimed the past few weeks that they could fire Amy because the posts were "unprofessional," but this is false. Amy's private speech is protected ***as is her manner of expression***. The Supreme Court anticipated Defendants' meritless defense several decades ago: "governments might soon seize upon the censorship of particular words as a convenient guise for banning the expression of unpopular views." Cohen v. California, 403 U.S. 15 (1971).

iii. As a factual matter, the notion that these private political memes were "unprofessional" is also a blatantly false and dishonest canard designed to disguise Defendants' distaste for the content of Amy's opinions. Most of the posts Defendants fired her for were simple political declarations of opposition to left-wing politicians and political movements Defendants support.

c. **The Reference to Parent Complaints is Pure Pretext**

i. Defendants' alleged parents complaints are transparent pretext, in addition to not being true.

ii. Not a single one of these alleged parent complaints—all very dated—that Defendants now contend warrant a sanction as severe as termination for cause, were ever formally raised with Amy Sacks as a disciplinary matter ***when they occurred***.

iii. Indeed, none of the complaints were even raised with Amy Sacks by Defendants in 2020, except one on June 22 of which Amy still does not know the specifics.

iv. Amy was never given a chance to rebut these alleged complaints from several years ago as they were never raised with her in a disciplinary context nor was she given the specifics of the alleged complaints.

v. It is highly suspect that any formal complaints were even made, and it appears that Defendants are simply trying to laundry list any incident even remotely involving Amy Sacks to defame her.

vi. The only parent matter that was (vaguely) raised with her, on June 22, was totally meritless and Russell was shocked to learn that it revolved around a serious medical situation.

177. The bottom line is that Defendants fired Amy Sacks because she political posts and memes they found offensive, and then they tried to incompetently cover up their attack on her job by defaming her and portraying her in a false light.

**Fourth and Fifth Element - That an Ordinary Employee would Be Deterred from Engaging in Protected Speech and that Defendants Acted Under Color of Law**

178. The fourth element is that an ordinary employee would be deterred by the retaliatory actions of the employer, and the fifth is that the Defendants acted under color of law.

179. Here, there is no question, given the immediate termination without notice and ambush of Plaintiff on June 22, that an ordinary employee in Sacks' position will be deterred from privately posting right-of-center opinions on Facebook. In a matter of a few hours, her life was destroyed. The District then threatened to terminate her and destroy her career if she contested anything over the next three weeks. The message was loud and clear.

180. Defendants at all points acted under color of law and held themselves out as having the authority and right to take the retaliatory actions against Sacks, and maintain to this day that using the Facebook posts to terminate her was proper.

**Sacks was Terminated and Constructively Demoted**

181. On June 22, 2020, Dr. Sacks was told without any prior notice that the Board had decided to terminate her from her principal position because of her Facebook posts. There was no legitimate legal or factual basis to do this.

182. What followed was three weeks of hell, as Defendants threatened to have her fully terminated from the district if she did not take a severe demotion. At no point was she told that

she needed a lawyer, or allowed to have an Act 93 representative present in the three meetings that took place.

183. On July 13, the District surprised her with a letter written by an attorney and told her it needed to be signed immediately. It did not tell her to get an attorney, did not give her time to review it, and it also offered false legal advice. It was written as if it was from defendant Russell, disguising its legal significance. It outrageously did not state what she had done wrong that could warrant termination or demotion—a deliberate omission shows that Defendants were conscious that their conduct was illegitimate.

184. Bizarrely, despite already being told that she was terminated as of June 22 from the principal position, and despite being told in the subsequent meetings that her remaining as an administrator was not an option, the letter characterized the termination as a "resignation." The letter also claimed that the demotion that Defendants had forced upon her in lieu of complete termination was consensual.

185. Defendants then told Plaintiff throughout the day the letter needed to be signed immediately, or she would face a board hearing and immediate termination. Under duress and coercion, Plaintiff reluctantly signed the letter that evening, but expressed her displeasure at how for three weeks Defendants had kept her largely in the dark, but then had rushed her demanded she sign this letter immediately in a few hours.

186. Note that at no point was Amy informed of her legal due process rights to a Loudermill hearing or to obtain an attorney, but instead told her from June 22 onwards that the decision to discipline her based on the Facebook posts had been set in stone before she even knew there was a problem.

187. A resignation is considered a constructive discharge if it was "involuntarily procured" "by coercion or duress," or by misrepresentations of material fact. See Judge v. Shikellamy School District, 905 F. 3d 122 (3d Cir. 2018); Schultz v. U.S. Navy, 810 F.2d 1133, 1136 (Fed. Cir. 1987). Also relevant is whether a reasonable person "would have felt compelled to resign." Id.

188. "An example of an involuntary resignation based on coercion is a resignation that is induced by a threat to take disciplinary action that the agency knows could not be substantiated." Staats v. US Postal Service, 99 F.3d 1120 (Fed. Cir. 1996).

189. The Third Circuit holds that where there is no cause for the threatened termination "the choice between resignation and the initiation of termination proceedings was 'purely coercive.'" Judge, 905 F.3d at 123 (quoting Schultz, *supra*).

190. This also goes for involuntary and forced demotions. Nicholson v. Petco Animal Supplies Stores, Inc., 409 F. Supp. 3d 323, 333 (M.D. Pa 2019) (stating that where employer's threats and other circumstances showing that the only two options given to the employee "were demotion and unemployment" a demotion is not "truly voluntary").

191. Here, it should be noted that the termination from the principal position was not "constructive" but instead actual because Amy was told on June 22 that the Board had already decided to terminate her because of the Facebook posts. However, to the extent that Defendants attempt to claim that the July 13 letter they foisted on her shows that she could consent to an actual termination that happened three weeks earlier, then Plaintiff alleges that any resignation was involuntary, forced, and coerced.

192. To the extent that Defendants attempt to argue that Amy Sacks consented to a demotion, the demotion was coerced, forced, and entirely involuntary as a result of atrocious

First Amendment and Fourteenth Amendment violations. Moreover, the demotion was actually a disguised termination because it was a long-term substitute position that would expire in a few months.[7]

193. As noted throughout this Complaint, the retaliation against Sacks was a malicious prosecution without any cause and was blatantly illegal "regardless of the fairness of the procedures used." See Daniels v. Williams, 474 US 327, 331 (1986).

194. Defendants' actions against Sacks go far beyond even the "purely coercive" conduct referenced in Judge and Schultz. Not only could the reason for discharge not be substantiated, but no disciplinary charge warranting dismissal (or any other punishment) was ever even identified on June 22, in the ensuring three weeks, or in the demotion letter. This was a malicious prosecution in every sense.

195. Note also that Defendants' failure to provide Amy due process, and their provision of incorrect legal advice, materially harmed her ability to make a voluntary, informed decision.

196. A reasonable person facing this concerted and illegal effort to coerce a resignation/demotion would feel compelled to involuntarily consent, especially because she was not advise to obtain independent counsel.

197. Furthermore, Defendants made material misrepresentations to obtain her resignation, including falsely telling her on June 22 that the Board had already decided to terminate her as principal, by providing false legal advice in the letter, and by claiming that Defendants could terminate and demote her because of her Facebook posts.

[7] To the extent that this signed letter is viewed as an agreement, it is invalid. Amy was induced to sign this letter by erroneous and materially incomplete legal advice. Furthermore, there was no consideration for this letter and/or the consideration provided was illusory. Amy got nothing from this letter and lost everything.

**The Individual Defendants are Not Entitled to Qualified Immunity**

198. When governmental officials are sued in their individual capacities under § 1983, they can only claim qualified immunity if the Constitutional rights at issue were not clearly established.

199. Here, the right at issue is Plaintiff's right to freedom of speech in non-school settings on issues not related to the school district.

200. Courts generally look to the Supreme Court and Courts of Appeal as to whether a right is clearly established; however, other authority may be cited as well.

201. Here, the right of public employees to speak freely about political issues in non-school settings on matters of public concern is near absolute, and even codified in Board Policy. See Board Policy 320 ***Freedom of Speech in Noninstitutional Settings*** ("The Board acknowledges the right of its employees, as citizens in a democratic society, to speak out on issues of public concern."); Board Policy 321 ***Political Activities*** ("The Board recognizes and encourages the right of its employees, as citizens, to engage in political activity.").

202. Indeed, the right to free speech in the First Amendment which protects Amy Sacks' Facebook posts is basic Civics 101.

203. The case law is likewise clear that public employees have a right to speak out on issues of public concern, as explained by the Third Circuit in Dougherty v. Sch. Dist. of Phila., 772 F.3d 979, 993-94 (3d Cir. 2014):

a. "Since at least 1967, "it has been settled that a State cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." Connick, 461 U.S. at 142, 103 S.Ct. 1684 ; see also Rankin, 483 U.S. at 383, 107 S.Ct. 2891 (finding the same principle

"clearly established"). In the case at bar, Dougherty's particular type of speech—made as a concerned citizen, purporting to expose the malfeasance of a government official with whom he has no close working relationship—is exactly the type of speech deserving protection under the Pickering and Garcetti rules of decision and our subsequent case law. See, e.g., Pickering, 391 U.S. at 566, 88 S.Ct. 1731 (protecting speech by teacher to local newspaper criticizing the school board and the superintendent's allocation of school funds); O'Donnell, 875 F.2d at 1060, 1061–63 (protecting speech by chief of police to local television station that accused township supervisors of various corrupt practices, legal improprieties, and abuses of their positions); Watters, 55 F.3d at 897–98 (protecting speech by program manager to local newspaper criticizing departmental program the employee oversaw where dispute existed over cause of disruption); Baldassare, 250 F.3d at 199–200 (protecting investigation into alleged wrongdoing of law enforcement officers where there was no "alter ego" relationship). Thus, Appellants had fair notice that their retaliation against Dougherty's constitutionally protected speech would not be shielded by qualified immunity."

204. This case is far more clear-cut than even those cases cited by Dougherty. The cases cited by Dougherty all involved speech that at least related in some way to the governmental employer's operations.

205. Here, the speech in dispute was private political expression on Sacks' private Facebook account completely unrelated to her employment, and were in fact almost entirely reposts of memes on political issues and the 2020 election.

206. All individual Defendants knew and should have known that Sacks' speech was protected, as evidenced by even their own Board Policies. They therefore have no qualified immunity.

207. Sacks is currently demanding reinstatement and refuses to legitimize Defendants' illegal attempt to terminate, demote, and humiliate her by taking the demoted position.

208. As a result of the First Amendment retaliation against Sacks, she has suffered grievous harm, including to her career, economically, mentally, emotionally, and reputationally.

209. Plaintiff also demands punitive damages against all Defendants for their outrageous and blatantly unconstitutional conduct which showed a reckless indifference to her rights.

*****

## COUNT II – First Amendment Retaliation for Political Affiliation

*Amy L. Sacks*

*v.*

*All Defendants*

210. Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

211. To make out a claim of discrimination based on political association, a public employee must allege (1) that the employee works for a public employer in a position that does not require a political affiliation, (2) that the employee maintained a political affiliation, and (3) that the employee's political affiliation was a substantial or motivating factor in the adverse employment decision. Goodman v. Pennsylvania Turnpike Com'n, 293 F.3d 655, 663-664 (3d Cir. 2002). Plaintiff must also show that an ordinary employee in her circumstances would be deterred from holding and expressing her political affiliations, and that Defendants acted under color of law.

212. Here, Sacks' position as principal for Evergreen Elementary School for the defendant District does not require a political affiliation.

213. Sacks' private Facebook contained and expressed statements of political affiliation.

214. As described throughout this complaint, Defendants took adverse action against Sacks based on the content of the posts, and also because of the express and implied political affiliations the post conveyed, including express opposition to Democratic political leaders.

215. Proof of this comes from several sources:

a. **Defendants' 6/22/2020 Ambush** - At this meeting, Amy Sacks was expressly told by Dr. Russell that the Board had already terminated her as principal because of the content of the posts and because they thought Amy was an offensive bigot.

b. **Defendants' Selection of Right-of-Center Facebook Posts** - Defendants combed through months of Facebook posting and ultimately decided to use 15 memes from Facebook to justify disciplining her. The selection of the posts themselves, the only similarity they shared was right-of-center viewpoints, demonstrates that this is why Defendants used them to retaliate against Sacks.

c. **Defendants' Pretextual Excuses are Belied by the Posts and the Law-** Defendants claim, to this day, that they are permitted to discipline Amy because the posts were "unprofessional." However, not only does Amy have a constitutional right to express her political opinions in whatever manner she sees fit, but many of the posts simply express political opposition to Democratic and left wing candidates, policies, positions, and movements. To label such posts "unprofessional" and retaliate against Amy on such an absurd pretext is unconstitutional.

216. In general, it has to be taken into account that the Perkiomen Valley School District personnel and culture are overwhelmingly liberal and democratic. The Defendant board members are almost uniformly Democrats.

217. The tenor of the public debate is now that any person perceived as having unacceptable opinions can and should be canceled for being offensive, as Russell made unequivocally clear to Sacks in the ambush on June 22, 2020.

218. As a direct and proximate result of Sacks' perceived political associations and perceived opposition to Defendants' favored political associations, she was disciplined, terminated, threatened, demoted, and coerced into signing the July 13, 2020 letter.

219. Note that as with the free speech retaliation claim, the rights at issue are longstanding and indisputable. The right to engage in Political Activities and associate and identify as one likes in nonschool settings is expressly recognized and codified in Board Policy. See Board Policies 320 and 321.

220. As a result, no defendant being sued on an individual basis can invoke qualified immunity.

221. As noted above, Plaintiff is attempting to mitigate her damages by demanding her reinstatement.

222. As a result of the First Amendment retaliation against Sacks, she has suffered grievous harm, including to her career, economically, mentally, emotionally, and reputationally.

223. Plaintiff also demands punitive damages against all Defendants for their outrageous and blatantly unconstitutional conduct which showed a reckless indifference to her rights.

*****

## COUNT III – PROCEDURAL DUE PROCESS

*Amy L. Sacks*
*v.*
*All Defendants*

224. Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

225. A plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of "life, liberty, or property," and (2) the procedures available to him did not provide "due process of law." Alvin v. Suzuki, 227 F.3d 107, 116 (3d Cir.2000). An essential principle of due process is that a "deprivation of life, liberty, or property `be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" Loudermill, 470 U.S. at 542, 105 S.Ct. at 1493 (quoting Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313, 70 S.Ct. 652, 656-57, 94 L.Ed. 865 (1950)). Due process fundamentally requires that the individual be given an opportunity for a hearing before she is deprived of her property interest. Id. Where a discharged public employee is given notice of the charges, an adequate explanation of the evidence, and an adequate opportunity to present his side of the story, his due process rights are not violated. McDaniels v. Flick, 59 F.3d 446 (3d Cir.1995), cert. denied, ____ U.S. ____, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996).

226. Plaintiff Amy Sacks alleges due process violations of three distinct types:

a. A property based due process claim, because she was terminated and demoted without notice depriving her of her right to continue in her employment

b. A stigma plus liberty due process claim

c. A reputation plus liberty due process claim

227. Note that certain government actions are barred regardless of the fairness of the

procedures used to implement them, which serves to prevent governmental power from being "used for purposes of oppression," Murray's Lessee [474 U.S. 327, 332] v. Hoboken Land & Improvement Co., 18 How. 272, 277 (1856) (discussing Due Process Clause of Fifth Amendment).)

228. Plaintiff wants to be absolutely clear that Defendants had no basis upon which to take any adverse action against her, and that even if she had been given the fairest of process it could not legitimatize what Defendants have done.

229. However, the conduct of Defendants during this so called process was so deficient that it must be subject to court review as a matter of public record.

**a. Due Process Claim for Property Interest in Continued Employment**

230. Dr. Sacks has a clear and indisputable property interest in her continuing employment.

231. "To have a property interest in a job . . . a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." Elmore v. Cleary, 399 F.3d 279, 282 (3d Cir.2005) (citing Bd. of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)). Whether a person has a legitimate entitlement to — and hence a property interest in — his government job is a question answered by state law. Id.

232. Here, under Pennsylvania law, Amy Sacks was a longtime certified administrator who could only have adverse disciplinary action taken against her for cause. In other words, she has the equivalent of tenure. She therefore has a property interest in continuing employment and not being disciplined without cause and in accordance with due process in the U.S Constitution as expressed by the U.S. Supreme Court.

233. Defendants also had a duty to comply with the Public School Code of 1949, which provides that she is entitled to written notice and a full hearing before the board.

234. The following actions were taken by the district without notice or an opportunity to be heard, in violation of the School Code and due process protections under the Fourteenth Amendment.

a. Sacks' Termination at the June 22, 2020 Ambush Meeting, Without Notice or Warning

  i. Amy Sacks was ambushed on June 22, 2020, by Dr. Russell and told that the Board has already terminated her from the principal position because of the Facebook posts. Only a strong government interest can justify the pre-hearing deprivation of a property right, usually related to public safety concerns, which are not implicated by this case. Smith v. Borough of Dunmore, 633 F. 3d (3d Cir. 2011) (stating that where employee can only be dismissed for cause, the plaintiff has a property interest in not being suspended without cause).

b. The Failure at Any Point to Provide Sacks a Loudermill Notice or a Hearing as Required by Law

  i. As noted, Sacks found out she was terminated on June 22, 2020 because of the Facebook posts. Following this termination, while Defendants discussed whether to demote her or entirely terminate her, she was never provided with a Loudermill notice of the charges or the supporting evidence, or an opportunity to be heard. At all points on June 22 and afterwards Defendants treated the decision to discipline Amy as final.

  ii. The termination/demotion also violated the Public School Code of 1949, which does not allow an administrator or Board to discipline Sacks without notice and without a hearing.

  iii. This entire process has been a predetermined sham which violated both the letter and spirit of the law.

c. The Extreme Delay in the Illegal Process by Defendants

  i. At no point was Sacks formally told what the charge was against her, or what policy she had actually violated, or what evidence supported such charges and immediate termination. Instead, Sacks was kept in the dark for three weeks while she threatened with full termination if she contested anything. This delay and the reasons for the delay violated her due process rights. The delay is exacerbated by the fact that the

disciplinary process had no legal basis whatsoever, and that the investigation was baseless and a delay tactic to attempt to force her to resign.

d. Sacks was Again Ambushed with a July 13, 2020 Letter She was Forced to Sign in Mere Hours

i. Sacks received a letter on July 13 drafted by the district's attorney. The letter did not clarify the attorney's role, did not advise her of her due process rights, did not advise her to seek independent counsel, falsely described the rights available to her, improperly failed to identify the actual charges being lodged against her, and demanded that she sign the letter in mere hours. This was all deliberate and done to force her to sign on a rushed basis to prejudice her rights.

e. Attempt to Retroactively Manufacture a Pretext for Termination after Receiving a Demand Letter

i. Although Defendants never gave Amy any formal or informal notice about parent complaints, defendant Russell attempted to force them into the fake August 13 evaluation. Defendants then absurdly tried to claim that Amy signed the July 13 letter because of the parent complaints—despite the fact she was not actually aware of any of them until receiving the August 13, 2020 letter.

235. It is simply incredible that Sacks was terminated without notice and that at no point did Defendants even attempt to provide her a Loudermill notice or hearing, nor comply with the Public School Code. These are indisputable due process violations.

236. Everything about Defendants' actions—starting with the fact that there was no basis to take any action against Plaintiff and ending with the attempt to manufacture pretext—evidence an improper retaliatory intent and lack of due process.

**b. Plaintiff has a Stigma-Plus Due Process Claim against Defendants**

237. A "stigma plus" claim occurs when the government imposes "a stigma or other disability that foreclose[s] [the plaintiff's] freedom to take advantage of other employment opportunities." O'Donnell, 148 F.3d at 1140 (quoting Roth, 408 U.S. at 573). The theory is, in essence, that some government action might impose such a harsh taint that it interferes with an individual's "right to follow a chosen trade or profession." Cafeteria Restaurant Workers Union,

Local 473 v. McElroy, 367 U.S. 886, 895-96 (1961).

238. This implicates Plaintiff's liberty interest, as opposed to her property interests.

239. The government must impose so great a constraint on an individual's future employment opportunities that it "involve[s] a tangible change in status" — that is, it must amount to "an adjudication of status under law." Kartseva v. Department of State, 37 F.3d 1524, 1527 (D.C. Cir. 1994); O'Donnell, 148 F.3d at 1141 ("[A] plaintiff who . . . seeks to make out a claim of interference with the right to follow a chosen trade or profession that is based exclusively on reputational harm must show that the harm occurred in conjunction with, or flowed from, some tangible change in status."). The action must have a "broad effect of largely precluding [her] from pursuing her chosen career." Kartseva, 37 F.3d at 1528; GE Co. v. Jackson, 610 F.3d 110, 121 (D.C. Cir. 2010).

240. The stigma does not have to result from official speech, but can also result from the overall nature of the conduct by Defendants.

241. Here, Plaintiff was terminated without notice for making right of center Facebook posts, Defendants then forced her to involuntarily consent to a demotion, and then Defendants attempted to manufacturing pretext for her demotion by crafting a defamatory evaluation full of dated issues never raised with her in the evaluation process and which she had never been given a chance to address. This was illegal First Amendment retaliation.

242. If Amy attempts to apply for a job anywhere, she will have to disclose the termination, demotion, disciplinary action, as well as the fake evaluation.

243. As a result of the concerted and deliberate effort by Defendants to terminate, demote, and create false negative evaluations of Sacks, Defendants have severely harmed and stigmatized Sacks and made it largely impossible for her to pursue her chosen career.

244. She has suffered severe damage as a result, including loss of employment, loss of wages, future employment, mental and emotional anguish, and loss of reputation.

245. She also requests that her name and reputation be cleared by the district.

246. Plaintiff's demand letter specifically requested that her name and reputation be cleared when it stated that Dr. Sacks was demanding: a "complete clearing of her personnel file of any mention of this incident," a "positive recommendation letter placed in her file, in the event she seeks new employment," as well as reinstatement.

**c. Plaintiff has a Reputation-Plus Due Process Claim Against Defendants**

247. As opposed to a stigma plus claim, a reputation plus claim requires that Plaintiff show that she was defamed and be accompanied by a discharge or demotion. This claim is only actionable when the employer has disseminated the reasons for the termination and the dissemination is defamatory.

248. Here, Plaintiff was terminated and then constructively demoted without cause or valid notice, constituting the "plus."

249. The last remaining element requires that the dissemination be defamatory.

250. The evaluation created by Defendants were in fact defamatory and placed Sacks is a false light. Not only are these evaluations available within the district to third parties, but any job application will have to disclose these defamatory evaluations.

251. She has suffered severe damage as a result, including loss of employment, loss of wages, future employment, mental and emotional anguish, and loss of reputation.

252. She also requests that her name and reputation be cleared by the district.

253. As noted, she expressly requested that her name be cleared on August 13, 2020.

**d. Defendants Should Have Known that their Allegations Against Sacks were False**

254. What is more, Defendants knew or should have known its defamatory attacks on Sacks in the August 13 fake evaluation about parent situations were false.

255. All of these matters were years old, and were not raised with Amy prior to this incident. Indeed, they were not raised in the evaluations for the years they happened in, and they were never broached with her in a disciplinary setting (formal or informal). In fact, Amy did nothing wrong during these situations, nor were her communications inappropriate. Defendants, by not affording Amy the chance to address these issues and present her side of the story, deliberately and willfully ignored the truth.

256. It should be noted that retroactively including these parental situations in the evaluation, to support discipline against Sacks, further violated the Sacks' due process rights and the Public School Code. She was given no notice or chance to be heard that any of this was at issue, and much of it was years old.

257. Note that no evaluation meeting ever took place, so the fact that this fake evaluation was put out to impugn Amy's reputation and paint her in a false light (after receiving a letter from Amy's legal counsel) is particularly egregious.

258. The termination, forced demotion, and evaluation will also necessarily have to be disclosed if Amy looks for a job elsewhere.

259. Because of Defendants' actions, Plaintiff's life has been destroyed, she lost her job, her career, and her reputation.

260. In today's day and age, accusations of the sort that Defendants have made against Sacks are a stake through the heart of a public educator's career. Defendants knew this, and acted deliberately to punish Sacks.

261. As a result she has suffered severe economic, mental, emotional, and reputational

damages.

262. The individual Defendants cannot claim qualified privilege because the rights at issue are clearly established.

263. Plaintiff also demands punitive damages against all Defendants for their outrageous and blatantly unconstitutional conduct which showed a reckless indifference to her rights.

*****

## COUNT IV – Declaratory and Equitable Relief - Reinstatement and Name-Clearing Hearing

*Amy L. Sacks*

*v.*

*All Defendants*

264. Plaintiff incorporates by reference and realleges the preceding paragraphs of this complaint pursuant to Pa. RCP 1019(g).

265. Plaintiff hereby demands reinstatement to her position as Principal of Evergreen Elementary School because she was illegally removed by Defendants, as explained throughout this complaint, as well as expungement of any disciplinary record which was the result of First Amendment or Fourteenth Amendment violations by Defendants. She demands injunctive relief reinstating her as this case is adjudicated, as well reinstatement of all pay and benefits during the pendency of this case which has been deprived of while she tried to amicably resolve this dispute without litigation.

266. Plaintiff hereby demands a name-clearing hearing on the Facebook post issue, as well as anything and everything included in the fake and fraudulent August 13, 2020 evaluation.

267. Plaintiff's demand letter specifically requested that her name be cleared when it stated that Dr. Sacks was demanding: a "complete clearing of her personnel file of any mention of this incident," a "positive recommendation letter placed in her file, in the event she seeks new employment," as well as reinstatement. <u>See</u> Exhibit 7.

268. Plaintiff's counsel further told Defendants' counsel that she wanted her named cleared and any trace of this removed from her file.

*****

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff demands judgment in its favor and against Defendants, jointly and severally, on all counts and claims compensatory damages in an amount in excess of this court's jurisdictional limitations, thereby guaranteeing Plaintiff a jury trial, exclusive of interests and costs, and an award of punitive damages, as well as prejudgment interest, post judgment interest, delay damages, costs, and such other equitable relief as the Court deems necessary; and requests that this Court determine and declare that Plaintiff be awarded for all counts:

a. Reinstatement and an injunction requiring that she be reinstated with pay and benefits pending resolution of this case.

b. A name-clearing hearing and purging of the negative evaluation and records

c. Compensatory damages, inclusive of any and all harm attributable to Defendants' actions or inaction, including loss of earnings, loss of career, reputational/stigma damage,

d. Mental and emotional pain and suffering;

e. Punitive damages to punish the Defendants for their outrageous conduct, self-interest, and duplicitous behavior, reckless and callous indifference to Sacks' rights, and evil motives;

f. Exemplary damages to set an example for others;

g. Attorneys' fees, costs, and court costs under § 1988;

h. interest;

i. prejudgment interest;

j. Delay damages;

k. Other equitable relief that may be necessary to enforce Plaintiff's rights; and,

l. Such other and further relief and/or equitable relief that this Court deems just and/or necessary.

*****

*Respectfully submitted,*

FRANCIS ALEXANDER, LLC
*/s/ AJ Fluehr*
Alfred J. (AJ) Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 341-1063
F: (215) 500-1005

THE BEASLEY FIRM, LLC
James E. Beasley, Jr., Esquire
1125 Walnut St.
Philadelphia, PA 19107
T: (215) 392-1000
F: (215) 592-8360

*Law Firm / Lawyer for Plaintiffs*
*/d/ January 12, 2021*

# Jury Trial Demand

Plaintiff hereby demands a 12-person jury trial.

*****

*Respectfully submitted,*

Francis Alexander, LLC
*/s/ AJ Fluehr*
Alfred J. (AJ) Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 341-1063
F: (215) 500-1005

The Beasley Firm, LLC
James E. Beasley, Jr., Esquire
1125 Walnut St.
Philadelphia, PA 19107
T: (215) 392-1000
F: (215) 592-8360

*Law Firm / Lawyer for Plaintiffs*
*/d/ January 12, 2021*

# Certificate of Service

I hereby certify that a true and correct copy of the foregoing First Amended Complaint was filed with and served via the Electronic Filing System on the following:

Joseph J. Santarone, Jr.
Marshall Dennehey
2000 Market Street | Suite 2300
Philadelphia, PA 19103
T: (215) 575-2626
E: jjsantarone@mdwcg.com
*Attorney(s) for All Defendants*

*****

*Respectfully submitted,*

Francis Alexander, LLC
*/s/ AJ Fluehr*
Alfred J. (AJ) Fluehr, Esquire
280 N. Providence Road | Suite 1
Media, PA 19063
T: (215) 341-1063
F: (215) 500-1005

The Beasley Firm, LLC
James E. Beasley, Jr., Esquire
1125 Walnut St.
Philadelphia, PA 19107
T: (215) 392-1000
F: (215) 592-8360

*Law Firm / Lawyer for Plaintiffs*
*/d/ January 12, 2021*